1                    UNITED STATES DISTRICT COURT

2                    DISTRICT OF CONNECTICUT

3    _____
     Christopher Meidl,        )
4              Plaintiff  )      NO: 3:15cv1317(JCH)
                          )      July 10, 2019
5     vs.                 )      10:07 a.m.
     Aetna, Inc., et al.      )
6              Defendants. )
     _____)      141 Church Street
7                                New Haven, Connecticut

8

9                         HEARING

10

11   B E F O R E :

12          THE HONORABLE JANET C. HALL, U. S. D. J.

13

14   A P P E A R A N C E S :

15   For the Plaintiff :  Andrew N. Goldfarb
                          H. Brian Hufford
16                        Zuckerman Spaeder LLP
                          1800 M Street, N.W., Suite 1000
17                        Washington, DC 20036

18   For the Defendants: Alex Gesch
                         Gibson, Dunn & Crutcher
19                       1050 Connecticut Ave., N.W.
                         Washington, DC 20036-5303
20
                         Thomas J. Finn
21                       McCarter & English, LLP
                         CityPlace 1
22                       185 Asylum Street
                         Hartford, Ct 06103
23

24

25

1          THE COURT:  It is a good sign there's no one in

2     the public area of the court on this day.  Anyways, we're

3     here this morning in the matter known as Christopher

4     Meidl on behalf of himself and on the certified class's

5     behalf versus Aetna, Inc. and Aetna Life Insurance, Inc.

6     315CV1319.  If I can have appearances please.

7          MR. GOLDFARB:  Good morning, Your Honor. Andrew

8     Goldfarb for plaintiff and certified class.  I'm here

9     with my partner, Brian Hufford.

10          THE COURT:  Good morning.

11          MR. GESCH: Alex Gesch, Gibson Dunn and Crutcher

12     for the Aetna defendants.  I'm with our co-counsel Tom

13     Finn.

14          THE COURT:  Good morning.  Today's

15     proceeding was calendared for action principally on two

16     main motions, Number 212, motion for settlement.  That is

17     the plaintiff's unopposed motion for the final approval

18     of class settlement along with Motion Number 207, motion

19     for attorney's fees and expenses and incentive award for

20     class representative.

21          There's a miscellaneous motion that I might as

22     well deal with that before we get into the merits, Number

23     213.  That's plaintiff's motion for leave to file an

24     exhibit under seal.  That's Exhibit C to the materials

25     submitted that pertain to five members of the class and

1     therefore, contain personal information.  Absent any

2     objection from the defense, I think the motion should be

3     granted.

4               MR. GESCH:  No objection.

5               THE COURT:  Motion number 213 is granted.  I

6     have in my notes that I would come out and the first

7     question I would ask was whether there was anyone who

8     wished to speak today.  There's someone back in the

9     public area, but I don't know if she's a member of the

10    class or a member of the team.

11              THE WITNESS:  Team.

12              THE COURT:  I don't see there's anyone present.

13    Obviously the matter has been noticed and notice of it

14    was provided to the members of the class and notice

15    approved by the Court.  Is plaintiff's counsel aware of

16    anyone that they have any inkling or reason to believe

17    did wish to speak?

18              MR. GOLDFARB:  No, Your Honor.  The only I

19    think, as we stated in our papers, we had one objection

20    that was withdrawn in writing, so that's the only one.

21              THE COURT:  It is going to be a better morning

22    for all of us if you make sure that mic.  You don't have

23    to talk into it, but if it's in front of you, the speech

24    will get picked up.  I can hear you, but it is hard for

25    the reporter.

1          MR. GOLDFARB:  Will do.

2          THE COURT:  Thank you very much.  If you can

3     hear yourself through the speakers that means I can hear

4     you.

5          I should put that on the record.  Apparently,

6     well, our Clerk's Office made a mistake.  We'll start

7     with that.  Not this woman.  She's my Deputy Clerk and

8     she's really good.

9          The main mistake was they failed to contact her

10    to ask what do I do with this.  We did receive dated June

11    6 directed to the Clerk of the Court of New Haven,

12    Connecticut.  That's exactly what your notice told people

13    to do.  A very short note.  It has not been docketed.  I

14    don't know that I think I should docket it at this point,

15    but I will put on the record what it says so it is a

16    matter of record.

17         To whom it may concern, I would like to speak at

18    the Fairness Hearing for TMS number, lists the case

19    number, July 11 at 10 a.m. my unique I.D and she gives

20    that number.  Then she writes Meidl versus Aetna, Inc.

21    regards and states her name.  A woman's name, last name

22    Wilson.

23         Our Clerk's Office, despite my order that anyone

24    who wished to file an objection could do so, did what I

25    call a return form, telling the person that you didn't

1    give a case number or docket number.  She actually did

2    give it.  That's the first problem with this notice.  And

3    telling them she has to comply with Local Rule 10.  If

4    only people not represented by counsel all complied with

5    Rule 10, life would be good.  That was a mistake to

6    return that.

7            When my Deputy learned of this that it had been

8    returned, she reached out to the woman and explained she

9    had a right to file it, a right to speak, et cetera.

10           By that time, she had spoken to plaintiff's

11   counsel.  So Diahann reported to me that she got a voice

12   mail from this Wilson woman, who is a member of the

13   class, and she said she sent the court an objection, but

14   the court returned it and why.  When she called the

15   Clerk's Office, they transferred her to Diahann.  Diahann

16   was not aware of it and the voicemail was the first she

17   knew.  She did some Clerk Office investigation which you

18   don't need to know about.

19           She then raised it with my judicial assistant

20   who pointed out the order that directed class members to

21   do exactly what Ms. Wilson did.  She then called Ms.

22   Wilson back to let her know we had made a mistake.  She

23   reported to Diahann what you report to me and that is,

24   quote, she had the opportunity to speak with plaintiff's

25   counsel after which she changed her mind about the

1   objection.  She sent a letter rescinding her objection

2   which Diahann at that time had not yet received, then

3   something about instructions to the Clerk's Office about

4   not rejecting these things.

5          There then came in subsequently, actually dated

6   the same day as June 6 but it wasn't received.  I guess

7   they were both received on the 10th.  It is a rather

8   lengthy handwritten note to the clerk saying, I'm sorry.

9   This is the statement of her objection.  She objected to

10  the proposed allocation of reimbursement to the class of

11  individuals denied claims for TMS treatment, et cetera.

12  I think it is inconseeable (sic) to reimburse those

13  affected anything less.  I had to pay $14,450.  That was

14  a hardship for me.  I had to take money out of my

15  retirement account.  This was 10 years ago and does not

16  even include the considerable amount of money I would

17  have gained in my mutual fund.  I need the money for my

18  future.

19         This discrimination of a marginalized class of

20  society which carries stigma is inconceivable.  It does

21  not include those who could not afford treatment and may

22  have lost their homes, employment, have been

23  hospitalized, many other deleterious lives.

24         Anything but the full amount of reimbursement is

25  unacceptable. This is an effective treatment.  It should

have been coerced as it was FDA approved. Other insurance companies were paying in other states.  I need my retirement money back.  Anything else is criminal.

I don't believe we ever received the rescission. Did we, Diahann?

THE CLERK:  Yes.  It is there.  I gave a copy of it.  It was received on the 17th I think.

THE COURT:  I apologize.  She's correct.  Dated July 11 but apparently not received until the 17.

To whom it may concern, I have spoken with class counsel June 11, 2019.  1 have a clear understanding of the settlement and would like to withdraw my objection and request to speak.

So I think that closes the book on what was a possible objection and request to speak.  The only thing I would ask, Attorney Goldfarb, is what did you explain to her?

MR. GOLDFARB:  Your Honor, there were two aspects from her letter that I explained to her.  She indicated she thought she was going to get a minimum amount of $1500 in the settlement.  I explained to her that depending upon what Aetna's record showed or her records showed, she might be eligible for a pro rata award.

The other piece was she expressed concern,

1    understandably, for people who couldn't afford the

2    treatment who had been denied authorization and explained

3    to her the class also included peopled that had been

4    denied preauthorization.  That didn't necessarily effect

5    her claim.  Just so that she understood the nature of the

6    settlement a little bit better.

7           And the class member did then subsequently

8    submit to the settlement administrator evidence of her

9    out-of-pocket expenditures for the TMS.

10          THE COURT:  So she's one of the -- is it 47?

11          MR. GOLDFARB:  Yes.  She's one of the 49.

12          THE COURT:  That's fine.  I wanted to understand

13   and make sure that she understands.  All right.

14          I guess unless you have some agenda or whatever,

15   I have certain things I need to move through before I

16   make findings.  So if I can start.  I want to make sure

17   the notice was provided.  I want you to confirm it

18   verbally that the notice was provided per my order.

19          MR. GOLDFARB:  It was.

20          THE COURT:  Were there any variations from it?

21          MR. GOLDFARB:  No.  Your Honor had requested one

22   change.

23          THE COURT:  That date.  I want to be reminded

24   about that.

25          MR. GOLDFARB:  Which had to do with making sure

1    that people understood that they or their counsel could

2    make submissions or appear on their behalf so we made

3    that change.

4          THE COURT:  You extended the time to do that.

5          MR. GOLDFARB:  No.  That was in the original

6    notice that went out to the class.  That had been Your

7    Honor's fix.  We did that and then on June 17, Your

8    Honor, approved our request to send the reminder notice

9    to the class.

10          THE COURT:  It was that late.  I don't know.  I

11    have something in my mind that motion requested me to

12    change a date because something hadn't been done.

13          MR. GOLDFARB:  So after we get Your Honor's

14    order on 17th, that day that went out, we extended the

15    opt out and objection deadline to June 26.  And we did in

16    response.  We appreciate Your Honor doing that.

17          In response we did get some additional

18    submissions to the settlement administrator from the

19    class members.  It was a helpful step.

20          THE COURT:  All right.  My understanding is the

21    mail success rate first time around was close to 99

22    percent.

23          MR. GOLDFARB:  Yes.

24          THE COURT:  You did a re-mail on anyone you

25    could locate an additional address for.

1          MR. GOLDFARB:  Yes, Your Honor.

2          THE COURT:  You got about 150 calls which is out

3    of a class of approximately 1400, 1500.

4          MR. GOLDFARB:  A little less.  About 1160.

5          THE COURT:  It looks like the calls on average

6    lasted 10 minutes.

7          MR. GOLDFARB:  Yes, Your Honor.

8          THE COURT:  As I understand it, Exhibit C that I

9    granted a motion to seal on, that reelects the names of

10   five class members who have opted out of the settlement.

11         MR. GOLDFARB:  Yes.  Just to update you on that.

12   Last night I received from the settlement administrator

13   an email that they had received.  They had received an

14   email from a class member that under the procedure set

15   out in the notice was an incomplete opt out.  It was a

16   class member who just in the subject line of the email

17   had opt out and had her name and address.  I tried

18   through a couple of different ways to call this class

19   member last night and was unsuccessful in reaching her.

20         THE COURT:  That would be a sixth opt out.

21         MR. GOLDFARB:  That would be the sixth opt out.

22   Candidly this is a class member who had received the

23   minimum amount and I, for whatever reasons, she sent in

24   the notice so we are.

25         THE COURT:  Let me ask defense counsel.  It

1    sounds like she didn't comply with the deadlines.

2          MR. GOLDFARB:  I'm sorry, Your Honor.  No, I

3    should have clarified.  This was an email that was

4    received and also mishandled or misplaced by the

5    settlement administrator.  So it was timely received, but

6    it was incomplete because it didn't indicate she actually

7    wanted to opt out and so forth.

8          THE COURT:  She's not one of the five.

9          MR. GOLDFARB:  She's not one of the five.

10         THE COURT:  If her intent was to opt out,

11      she would be the sixth.

12         MR. GOLDFARB:  Yes.

13         THE COURT:  Does that effect the defendant's

14   view of the settlement?

15         MR. GESCH:  It does not, Your Honor.

16         THE COURT:  Thank you.  Another question that I

17   had and I apologize because I didn't last night have time

18   to circle back and find exactly where this issue arises.

19         It is I think in the preliminary motion.

20   There's a section of the settlement that talks about the

21   residual funds going to blank.

22         If I have a bad memory on this, just smile at

23   me, shake your head, say no, Judge, that doesn't exist.

24         MR. GOLDFARB:  I'm sure there was and it may at

25   that point had been blank.  I thought that we had

1    identified in a subsequent filing or in that filing that

2    we proposed that the residual funds go to the Semel

3    Institute at UCLA.  It is a brain science department at

4    UCLA that does very productive and helpful work.  Our

5    hope is to disseminate almost all of the settlement

6    amount.

7         THE COURT:  Sometimes checks get returned if

8    somebody has moved or gets lost.  They don't think to

9    call for it to be reissued.

10         MR. GOLDFARB:  Yes.

11         THE COURT:  I was concerned.  This has been a

12    subject not so much recent, recent at the Supreme Court,

13    although they didn't really grapple with the issue.

14    There was a few clues in there that the old practice of

15    in this district, for example, many judges would have the

16    residual go to our bar foundation that supports fees for

17    indigent people and legal services community.  I'm not

18    sure that would be looked upon kindly anymore after the

19    comments in Goss.  But there's some Second Circuit

20    teaching on this.  I might have discretion.

21         My thought was it probably should go to some

22    educational research community that is in this area of

23    mental health, depression.  I'm not saying it has to be

24    specific but something like that.  It sounds like you

25    have located that type of an institution.  Is there any

1    objection from the defendant if that's what gets added to

2    the order?

3           MR. GESCH:  No, Your Honor.

4           THE COURT:  Thank you.  Is that now in the final

5    order?  I missed it if it is.  Your proposed order,

6    Document Number 205.

7           MR. GOLDFARB:  I don't think it is.  We did not

8    refile the Plan of Allocation which I should have done to

9    include that so I'm happy to do that or --

10          THE COURT:  I will make a note.

11          MR. GOLDFARB:  I'll proceed however Your Honor

12   prefers.

13          THE COURT:  Well -- yeah.  Okay.  I was going to

14   have class counsel just briefly lay out the settlement

15   terms.  To be honest with you, I think I have a good

16   grasp, but we'll have a little test.  How is this?

17          My understanding is that every class member gets

18   the greater of the fixed award which I think is $1,500 or

19   a pro rata share based upon their demonstrated

20   out-of-pocket expenses and which is the larger of the

21   number that Aetna has records for or the plaintiff class

22   member can demonstrate.

23          MR. GOLDFARB:  Correct.

24          THE COURT:  This is another thing that I meant

25   to double back and check last night.  But I have a

1    recollection I think it is, you know, something to do

2    with the attorneys fees filings that a number changed.

3    Was it the settlement number or an attorney's fees

4    number?

5         MR. GOLDFARB:  The number that changed from in

6    the most recent filing for final approval, you can tell

7    me if this is the number that Your Honor is talking

8    about.  Some of the denied out of the -- the denied

9    billed charges for TMS for denied claims went up from

10   about I think it was about 6.35 million dollars to 6.6

11   million dollars because of these 49 submissions that we

12   received where class members documented there

13   out-of-pocket expenditures.

14        THE COURT:  All right.  So the impact of that is

15   to lower slightly the percentage of recovery in an

16   absolute sense versus the out of pocket or the

17   compensation piece to the total pool of compensation?

18        MR. GOLDFARB:  Yes.  I think the percentage out

19   of billed charges went from about 98 percent to 94

20   percent and based on our preliminary or subsequent

21   allocation run that we project, it may have changed the

22   pro rata percentage by one percent perhaps but not much

23   more than that.

24        THE COURT:  Explain to me -- here's where I

25   couldn't pass the test.  What's the mechanics of the

1    distribution of the settlement fund?  Are the pro rata

2    claims paid out first?  Are the $1500 claims paid to the

3    non-47 and then what's left is pro rata among them

4    proportionate to their number that's been determined by

5    Aetna or them, whichever is greater?

6           MR. GOLDFARB:  Under the Plan of Allocation, we

7    first ran essentially a pro rata allocation and made sure

8    that some people either because they were denied a

9    preauthorization and never submitted any claims to Aetna,

10   so they would be natural candidates to get the minimum

11   amount.

12          Then there are also class members who may have

13   submitted one or two claims to Aetna, so their pro rata

14   share would also fall below.

15          So we essentially assured that everybody was

16   getting the minimum and then skim those out, look at the

17   pot that's left, those people will be getting their share

18   pro rata.

19          THE COURT:  The numerator of what's left in the

20   pot of the denominator?

21          MR. GOLDFARB:  Yes.

22          THE COURT:  I think it would be helpful.  I can

23   probably do this.  It is better for you to do it.  To lay

24   on the record what were the perceived risks for the

25   plaintiffs if the case had proceeded to trial as it was

1    scheduled for including I think in particular in this

2    case, it strikes me what remedy was or was not available

3    to the class.

4         MR. GOLDFARB:  Sure, Your Honor.  Through the

5    developments in the course of litigation, the prospective

6    relief that the plaintiff sought was no longer available

7    because the named plaintiff was not eligible for

8    forward-looking relief, pursuant to the Court's ruling.

9    I think it was class certification and so this was a

10   class seeking retrospective relief.  The relief that

11   the --

12        THE COURT:  But you obtained that relief during

13   the course of the litigation?

14        MR. GOLDFARB:  We did.

15        THE COURT:  I suspect Aetna would not say and I

16   don't expect them to say it was because of the

17   litigation, but I can believe that if I want to?

18        MR. GOLDFARB:  Right.

19        THE COURT:  Would that be fair?

20        MR. GOLDFARB:  You could also look at Exhibit 39

21   to our Summary Judgment filing which would support that.

22        THE COURT:  That's fine.  That's all I need.

23        MR. GOLDFARB:  So Your Honor, looking at the

24   remedy first, were we successful throughout the

25   litigation, the relief that we sought and that would be

1    available to class members would be a reprocessing

2    relief, i.e., we would ask Your Honor under a corrected

3    standard, to send the claims back to Aetna for

4    processing.

5             THE COURT:  Right.  Then it was an individual

6    patient by patient determination of whether this

7    procedure was a covered procedure, even if it meant they

8    rolled back their, whatever it is called?  CBF.  Summary

9    Judgment was a while ago.  The CBF549.

10            MR. GOLDFARB:  CBP469.  The Clinical Policy

11   Bulletin.

12            So in processing, as Your Honor recognizes,

13   there would be class members who may -- who would either

14   have their claims covered in whole or in part or could

15   again be denied as either having their condition deemed

16   to be one that falls outside of the clinical policy or

17   that they don't meet the medical necessity or otherwise

18   meet the medical necessary criteria.  Those people would

19   then again be without benefits for their TMS.  The

20   settlement obviously provides relief -- significant

21   monetary relief to all class members.

22            And then in addition, Your Honor, even on

23   reprocessing, the awards to the class members presumably

24   would have been affected by co-insurance, deductible and

25   perhaps other co-payment obligations such that that would

1    further reduce the relief obtained on reprocessing.

2          THE COURT:  On the calculation of the person's

3    pro rata share, Aetna was doing it and then they should

4    show it was a higher, they would go with the higher.  Is

5    that a number of what the plaintiff actually paid or is

6    it a number of what Aetna would have paid had they

7    covered the treatment at the time?

8          MR. GOLDFARB:  Is Your Honor -- the number that

9    we have -- I want to make sure that I'm responding to

10   Your Honor's question.  The number in Aetna's records

11   that were used is the amount of billed charges for denied

12   claims, i.e., what the provider charged the patient.  Not

13   what Aetna would have paid.

14         THE COURT:  Which presumably would be lower, so

15   you used the gross number?

16         MR. GOLDFARB:  Yes.

17         THE COURT:  Another question.  I'm sorry to

18   interrupt you.  You mentioned it a minute ago this number

19   70 percent of what the benefit would have been from Aetna

20   had they covered it is what the pro rata class is going

21   to achieve in effect.

22         MR. GOLDFARB:  Yes, Your Honor.

23         THE COURT:  Is that gross or after fees?

24         MR. GOLDFARB:  That is, Your Honor, that's after

25   fees and also that's with a rough calculation of the

1   co-payment, deductible obligations that Aetna has

2   historically taken.

3          THE COURT:  Let's say there was a co-pay for

4   specialist of $35.  The billed amount they wouldn't have

5   paid that had they actually covered this service.  They

6   would have paid whatever the bill.  Let's assume what the

7   bill was less the 35, just by way of an example, so your

8   70 percent is off the less 35 or the gross before the

9   deduction?

10         MR. GOLDFARB:  Our understanding from our

11  discussions with Aetna is that Aetna has -- I don't know

12  if I can break it out so granularly.  For the TMS amounts

13  in Aetna's records that Aetna had paid, I think it was

14  about 65 percent.  It was in the range of 60 or 65

15  percent.  I can't remember the exact number, but that was

16  the percentage of billed charges that Aetna was

17  reimbursing, so when I mention the 70 percent figure, we

18  used that as a rough --

19         THE COURT:  Elsewhere, though, and I

20  unfortunately I didn't write the page number down so this

21  is going to be a problem, if you don't remember what I'm

22  talking about.  I know at page 11 of your 207-1 filing is

23  that 70 percent figure.  But I don't know where I got a

24  quote which I wrote down which was to ask you to explain,

25  quote, 98 percent of total amount class was billed for

1    claims Aetna denied.

2              MR. GOLDFARB:  Yes.  I mentioned that earlier

3    so.

4              THE COURT:  How do those numbers correlate,

5    though?

6              MR. GOLDFARB:  Well, the settlement amount of

7    6.2 million dollars is 98 percent of 6.35 million dollars

8    which at the time of preliminary approval was from

9    Aetna's records the total amount of charges that were

10   billed for TMS on claims that Aetna denied.  So if I were

11   an Aetna insured and I submitted a $500 bill for TMS,

12   that would be --

13             THE COURT:  That's 6.35.

14             MR. GOLDFARB:  Yes.  That's the 98 percent

15   number and then we also, because we are able to give

16   everybody a substantial, I think it is appropriate to

17   give everybody a substantial minimum amount, we also just

18   wanted to do a rough calculation of what those who were

19   seeking a pro rata share would receive relative to what

20   they would have received had their claims been covered in

21   full by Aetna.

22             THE COURT:  Okay.  I got you.  Okay.

23             MR. GOLDFARB:  Your Honor, I'm sorry to jump in

24   but some of the risks that you ask that we identify,

25   those are the ones that focused on if we won everything

1    and the claims were sent back to Aetna for reprocessing.

2    Of course, at page 15 of our final approval motion, we

3    set out what the risks were to get to the finish line.

4    There was, of course, our trial risks and appeal risks

5    both with respect to the class.

6              THE COURT:  And the merits.

7              MR. GOLDFARB:  The class and the merits and

8    then, of course, the uncertainty of the result at the end

9    of all of those things and the time value of money here

10   really favors a strong settlement for the class.

11             THE COURT:  Do the defendants have any comment

12   they wish to make about the I will call it the merits of

13   the settlement or the terms of the settlement?

14             MR. GESCH:  No, Your Honor, other than to say

15   that we're pleased it has been resolved, and we believe

16   it should be approved.

17             THE COURT:  I think I should turn to attorney

18   fees, so I can do my findings as a whole.  I'm not sure

19   what chaos I engendered at the law firm of the plaintiffs

20   when I asked for supplemental briefing.  Sometimes I tell

21   people what I'm thinking, then they get to try to figure

22   out how to get me to change my mind if they don't like

23   it.  I'm not sure that you will dislike what I'm

24   thinking.  I have a number of questions to ask, but you

25   shouldn't lose heart, I guess I will say.

1           This is probably a perspective I have that is

2    not just this case so maybe you're just the unfortunate

3    people to come through today.  My understanding of your

4    law firm is it has an outstanding reputation as a class

5    action plaintiff's firm.  Am I mistaken in that

6    impression?

7           MR. GOLDFARB:  Your Honor, we have -- I have

8    partners and colleagues who do class action work and I do

9    as well and Mr. Humford has certainly focused a lot of

10   his practice on it.  It is about ten percent of our

11   firm's overall receipts.

12          THE COURT:  That's my misunderstanding.  Maybe

13   that's the only time I have seen your firm is in

14   plaintiff's actions but okay so.  I'm aware of

15   plaintiff's lawyers who rarely do hourly work but come in

16   and say their, quote, billable rate is X and it is the

17   rate they tell people who want them to be local counsel,

18   some law school classmate.  I'm sorry I have to bill you

19   $1,000 an hour because I tell the judge that's my

20   billable rate.  That's never been billed and will never

21   get billed, right?  That was my impression of your firm

22   and that's a misimpression.

23          MR. GOLDFARB:  That is.  We were overwhelmingly

24   an hourly fee arrangement firm.  The percentage varies

25   year to year depending on the activity and investment in

1    class action cases.  I think I used ten percent.  Some

2    years obviously it is going to be higher.  Some years

3    might be lower.

4        THE COURT:  The fees some years will be a larger

5    percentage of your income and other years it will be a

6    smaller one.  What percentage of your work is done at

7    your firm on an hourly basis?  Now, I'm understanding it

8    is somewhere north of three-quarters and maybe closer to

9    ninety percent.  Okay.

10       With respect to the people who worked on this

11   file, of course, there's a long list of people.  Some of

12   them I can take great exception to the idea of someone

13   who was a 1-L when this lawsuit was filed.  He had been

14   in law school one month.  He didn't bill many hours.  He

15   may be the brightest guy in the block.  The idea he's

16   charging $475, I think I can get agreement from local

17   counsel in this case that I think the partner of the

18   local counsel, Attorney Acee, who is an outstanding and

19   excellent attorney, that's her billable rate having been

20   a partner, maybe 10 years, maybe it is not that long.

21       So I understand the national versus the local,

22   but there's some of them I look at and I say a paralegal

23   $335.  There's no paralegal who has such an expertise in

24   mental health class actions that she's indispensable as a

25   paralegal.  So I'm just venting here a little bit.  You

1    should sit down and not say anything.  You can take a

2    deep breath.  You will be fine.

3         I think you have made the case and I will make

4    the finding that there was no Connecticut firm who was

5    certainly as well positioned as your firm and probably

6    not at all positioned to take on the nature of this case.

7         I think there's certainly highly qualified

8    lawyers in Connecticut who could do class actions who in

9    fact now do ERISA class actions.  I will buy into the

10   argument that the mental health side of insurance

11   coverage and medical treatment has its own little area of

12   expertise and I think this case benefitted from what was

13   brought to it by people in your firm with that expertise.

14        I really feel bad doing this, Attorney Goldfarb.

15   I noted in your biography, you were the lead lawyer on

16   this case.  I think you billed over 50 percent of the

17   hours and you did a very outstanding job.  Obviously the

18   outcome here is in large measure due to the work you put

19   in the case and your advocacy on behalf of your clients.

20        I noted that this was the only class action

21   involving mental health that you had on your experience

22   in your bio.

23        MR. GOLDFARB:  Your Honor, that's not quite

24   right.  I think my declaration in some of the other

25   papers indicated I actually ran an earlier case that was

1     another TMS case that was a class case.  I'm also

2     currently.  I did another case, another punitive class

3     case in Colorado that had to do with mental health

4     issues.

5              THE COURT:  All I had to do is ask.

6              MR. GOLDFARB:  I appreciate the opportunity to

7     respond, Your Honor.  Thank you.

8              THE COURT:  Does the defense have any comment on

9     the attorney's fees sought in the case?

10             MR. GESCH:  No, Your Honor.  Under the

11    agreement, we agreed not to take a position on this

12    petition, but we have no objection.

13             THE COURT:  Probably wouldn't help if I asked

14    you guys your hourly rates.  Will persuade me maybe I

15    made a mistake going on the bench.

16             MR. GESCH:  Up to Your Honor.

17             THE COURT:  All right.  Could someone remind me

18    of -- oh, there it is.  Okay.  It is my intention unless

19    anyone thinks this is a bad way to proceed to put on the

20    record my findings.  Obviously you have articulated in

21    your order proposed findings.  I think a little more

22    detail than that is appropriate.  Not that there seems to

23    be any threat of appeal here, but unless there's an

24    objection to my doing that, I intend to do it on the

25    record today rather than writing a ruling and delay this

1    any further and would be prepared to enter the order

2    consistent with these findings.  Hearing no objection.

3            MR. GOLDFARB:  No objection.

4            MR. GESCH:  No objection.

5            THE COURT:  You could object, you know.  It

6    could be that you have done fifteen of these and I don't

7    know the right way or what I'm supposed to do.  We don't

8    do this every day in this little back order of

9    Connecticut where we charge ridiculously low attorneys'

10   fees.

11           Obviously in this case, it was brought by

12   Mr. Meidl and seeking to represent a group of people

13   similarly situated to himself against his insurance

14   company, claiming that they had wrongly denied coverage

15   for treatment known as TMS for the treatment of

16   depression.

17           After briefing and argument, I believe although

18   that was a while ago, the Court certified a Rule 23(b)(1)

19   and (b)(2) class.  If, at any point, I say anything

20   that's not correct, please let me know.  After I did that

21   and before I did that as well as after, the case

22   proceeded through what I viewed from a far. I wasn't very

23   much involved in the discovery but through substantial

24   discovery efforts and then, of course, the closing of

25   discovery and the briefing on the motion for Summary

1   Judgment.  I do recall that motion quite well.  Obviously
2   the Court denied it.

3         In the Court's view, there were issues of fact
4   which would necessitate a trial.  But more important for
5   the purposes of today's ruling, demonstrated the risks to
6   both sides in going to trial and therefore, the benefits
7   of a settlement in this case.

8         Obviously, while the defendant was unable to
9   persuade me that their expert alone would lead me to
10  conclude there was no issues of fact, it could be that
11  their expert was extremely talented, clear thinking and
12  persuasive vis-a-vis a jury and the plaintiff would have
13  walked away with nothing I think if that were the case.

14        The trial was set for March 11.  It was referred
15  to the magistrate judge.  The parties have reported to me
16  that they engaged in substantial conversations and
17  efforts to focus their discussions and to get in a
18  position to be able to settle this case and, of course,
19  they spent time with Magistrate Judge Merriam.  And there
20  was an agreement in principle reported to her and through
21  her on January 10 of this year.

22        The rough terms of the settlement which, of
23  course, are laid out in very great detail in the papers
24  before me, call for the defendant to pay to the class 6.2
25  million dollars, calls for an incentive award to the

1  named plaintiff of $20,000 and also calls for fees and

2  expenses to be approved by way of application to the

3  court, but not to exceed one third of the settlement, at

4  least by way of agreement.  It doesn't mean they couldn't

5  have sought more than a third.  The defendant agreed to

6  that.

7        As I have already stated in a nutshell, each

8  class member will receive at a minimum $1500 and those

9  who can either demonstrate through Aetna's records or

10  their own records expenditures for the denied covered

11  treatment in excess of the $1500 will receive a

12  proportionate pro rata share.  And we have discussed some

13  of the percentages of actual expenses or actual claims

14  versus the recoveries, all of which are in this Court's

15  view -- impressive is probably not the right word.  I

16  would say they are significant recoveries.  This is not

17  one of those cases you see on the front page of the

18  newspaper where somebody got a coupon for new jeans.  The

19  plaintiffs in this class according to the terms of this

20  settlement will actually yield a substantial monetary

21  payment.

22        In return, the defendant receives a release from

23  the class which is a complete and utter release.  It is

24  not more than they are entitled to.  But it does

25  completely absolve them of liability for any claims on

1    the denial of this treatment TMS.  And it also includes a

2    waiver for those members of the class who are from

3    California.

4            Under California state law, I think it is

5    Section 1542 of the Civil Code, and upon reviewing some

6    case law in particular, *In re: Macy*, a Second Circuit

7    case in '03, the Court is persuaded that that's an

8    appropriate waiver of a right under the state statute and

9    indeed my colleague, I believe it's Judge Underhill in a

10   recent class action known as *In re: Aggrenox* approved a

11   settlement with a waiver of that same section's rights.

12           I believe a class member can waive those rights

13   and the release that the defendant receives reflects a

14   waiver of those rights as well as the general rights to

15   recovery for claims for denial of TMS coverage in the

16   past.

17           In addition, I will note that the policy that

18   upon which the lawsuit began by way of attacking has been

19   changed at some point into the litigation.  I recall 10

20   months, but I could be mistaken about that, so that other

21   than individual bases under which the insurance company

22   might decide they have a right not to cover a particular

23   claim.  For example, someone's policy expired.  Somebody

24   wasn't a covered insured.  They were 26 years old plus

25   one month.  Other than those kind of reasons this is a

1    treatment that's generally covered as I understand it,

2    which, of course, while obtained during the litigation

3    not as a result of the settlement.  Nonetheless, in the

4    Court's view, an accomplishment of the plaintiff's

5    actions in bringing this case.

6         The Court finds that the notice that was given

7    to the parties which the Court reviewed prior to the

8    process being begun and the appointment of an

9    administrator, the Court finds the work of the

10   administrator was appropriate and well done and that the

11   notice was adequate under Rule 23(c)(2)(b) as well as

12   general due process principles.

13        Also I noted, direct mail achieved a very high

14   result.  I've had cases money letter, 99 percent and

15   there was re-mailing efforts.  The Court further finds

16   that the CAFA notices that were sent out by the defendant

17   to the state's attorneys general's involved were adequate

18   and they were sent as required.

19        Further, the Court finds the settlement under

20   Rule 23 (b)(2) to be fair reasonable and adequate.  First

21   of all, I compliment plaintiff's counsel quite capably

22   provided more than adequate representation of the

23   interests of both the named plaintiff and the class

24   members.

25        The class representative who seeks an incentive

1    award of $20,000 that the Court finds to be reasonable in

2    this case given his involvement as represented by

3    counsel.  He clearly spent time which he should be

4    compensated for in prosecuting this case on behalf of

5    approximately 1100 other people and obtaining a result

6    for the 1100 other people that is substantial.

7          So the Court finds he was both adequate and

8    effective representation and awards to him an incentive

9    payment of $20,000 from the class settlement fund.

10          Second, the Court finds that the settlement here

11   was absolutely and clearly negotiated at arm's length.

12   This was a hotly fought and contested litigation.  I do

13   compliment counsel on both sides at least from a 9,000

14   foot view for me.  It was very civilly conducted and

15   unfortunately, that's all too rare in the practice of law

16   these days, especially in these kind of cases where

17   parties feel very strongly on both sides.

18          There's a lot at stake.  I know that, as I've

19   already articulated.  The case is not a case where

20   settlement came three days after being filed.

21          Clearly, the plaintiffs knew exactly what their

22   case was.  They knew what evidence they had obtained.

23   They had an expert to advise them and assist them.

24   Co-counsel was an expert in this field as well as counsel

25   in the lead firm.  They were very deep into the case and

1    clearly were in a position as experienced counsel to

2    weigh the risks and benefits that they faced at the point

3    of post summary judgment heading into a trial.  I think

4    the estimates would have been at least a couple of weeks

5    and which involve complicated and challenging expert

6    testimony and also clearly, although I'm not so worried

7    and the defendant, they obviously also obtained

8    discovery, understood the case and risks and the benefit

9    of settling.

10           Thus, at the end that means that it was

11   negotiated at an arm's length and finally, it was

12   negotiated with assistance of the magistrate judge.

13           The Court finds that the relief I think the

14   legal term I have to decide was it adequate.  I think

15   that words understates the nature of the relief obtained.

16           While I can't say technically the change in the

17   policy was obtained by the settlement, I think there's no

18   question that it was obtained by Mr. Meidl deciding that

19   he was wanting to challenge Aetna's determination on this

20   medical issue.  As a result of the filing of the lawsuit,

21   counsel taking on the risk of this case, that that

22   outcome was achieved.

23           Further, as was just explained, that I

24   understood but needed to hear it again, had the case gone

25   to trial, been won by the plaintiff and the class and

1    been upheld on appeal, all of which I have very large

2    capital I-F'S in front of each of those, the result

3    obtained here could not been achieved. In other words, A

4    negotiated settlement achieves something that the lawyers

5    and Mr. Meidl could not have achieved through the full

6    litigation process.

7           As I understand it -- again I would hope

8    somebody will stand up and correct me, but had the case

9    gone to trial, the most that would have happed is that

10   each of the class members would have a right to in effect

11   refile their claim.  That's if the jury found this policy

12   was inappropriate under the policy of the insurance.

13   They would have a right to submit the claim again and

14   have Aetna decide whether, in fact, have you met all the

15   requirements of the insurance policy even though we now

16   will call this a covered treatment.  There's still other,

17   shall I say, hoops one must jump through in order to get

18   coverage.

19          While I suspect in many cases, the coverage

20   would have been found and payments would have been made,

21   that would not been the case for everyone, and it would

22   have been an additional process.  I suspect significant

23   numbers of people would not have gone through with it.

24   Therefore, they would have got nothing after a trial and

25   an appeal.

1          Whereas in the settlement before me, which I'm

2     judging is adequate as that term is called for in the

3     Rule 23 context, every class member receives something.

4     And the something is not an insignificant sum in the

5     context of class settlements.  It is actually quite a

6     significant amount of money.

7          And further, those who actually were out of

8     pocket, who went and got the treatment and had to spend

9     their own money, received I think we talked about in the

10    70 percent range of what they will receive approximately

11    depending upon the final numbers.  But approximately what

12    they paid for the service they actually obtained.

13         So I find that viewed in light of the risk and

14    the delay of going through trial and ultimately what I'm

15    sure would have been an appeal, based on the method of

16    distribution employed which I understand it will be

17    forthwith, immediate, whatever the right term is in terms

18    of cash in the class member's pockets.

19         Further, I find it is a fair distribution in the

20    sense of those who paid out of pocket will receive a

21    pro rata share of those and those who were I guess if it

22    had been found liable, would have been deemed to have

23    been wrongly denied their insurance benefits, even though

24    they had no out-of-pocket payment, will receive a

25    significant cash payment.  All of that the Court finds is

1    a fair distribution.

2              Lastly, the Court views the approach of the flat

3    payment versus the pro rata share for those who actually

4    expended money that exceeds the pro rata share.  That's

5    an equitable balance of the interest of the class

6    members.

7              And, lastly, I guess in terms of whether the

8    relief is adequate the question of the subtraction of the

9    attorney fees and costs which counsel seek the one-third

10   of the settlement fund, the Court will address that in a

11   moment.  There's nothing about that which would call into

12   question in the Court's mind the adequacy of the relief

13   obtained.  And I guess supportive of these conclusions

14   under Rule 23 are some observations to be made.

15             One, there were no objections even though notice

16   was almost 100 percent effective and mail notice I think

17   is effective.  No one has chosen to speak to come today

18   to oppose this or any aspect of it.

19             Lastly, there are five or possibly six opt outs

20   out of a total class of 1100 which the court, as I said I

21   don't have a lot of experience, but I've read a lot of

22   cases.  That seems quite low for me.

23             Therefore, those things to me speak to the fact

24   that those who were injured arguably by the denial of

25   their coverage are satisfied with the resolution of the

1    matter as a compromise.

2         As to approval of the settlement, have I made

3    sufficient or adequate findings in the view of

4    plaintiff's counsel?

5         MR. GOLDFARB:  Yes, Your Honor.

6         THE COURT:  From the defense?

7         MR. GESCH:  We agree.

8         THE COURT:  Let me now turn to the question of

9    fees.  I will first observe that the plaintiff's counsel

10   have sought to be compensated by percentage of the

11   settlement in the amount of 6.2, and I will note that the

12   Second Circuit -- clearly the trend in the Second Circuit

13   is to favor a percentage recovery for the class.

14        I will cite *McDaniel versus Schenectady* which is

15   a 2010 case, but it is not the only one out there.

16        Obviously the lodestar in this circuit anyways,

17   at least until the Supreme Court tells it not to, we

18   still look to the lodestar, as I think it is called a

19   check on the percentage so as to be certain that the

20   percentage is not undeserved, I will call it, windfall

21   for counsel.

22        Under Goldberg and related cases, there's a

23   number of factors that I need to look at.  Time and labor

24   expended.  Relying upon the time records kept by

25   plaintiff's counsel which I have no reason to question

1    because defense counsel isn't attacking them.

2          But it strikes me the amount of hours put into

3    this case are reasonable in light of the work that went

4    on in the case and my knowledge of that work.  The total

5    number of hours seems proportionate to what the effort

6    was.

7          Obviously considering the magnitude and

8    complexity, I think the case, it is not the largest ERISA

9    case that's ever been brought.  It was a sizeable case.

10   Involves a sizeable number of people and particularly as

11   I commented earlier, the nature of the question of mental

12   health treatment really made it more complex than some

13   other ERISA coverage cases might be.

14         I have also spoken already about the risk.  I

15   think there was a huge risk here for both sides.  As a

16   lawyer and that's a long time ago, I tried cases.  I

17   would never tell the client that he had better than a 35

18   percent chance of winning or losing depending on which

19   side of the line I was on.  I did that because there's

20   too many variables. Sometimes a client would say that

21   just shows that juries are not a fair system.  I would

22   say absolutely not.  It is how do you get from here to

23   there with the jury.

24         I have seen too many plaintiffs who fail to

25   connect up damages and show a causal relationship as

1    required under Connecticut state law between the injury

2    liability and the damage and they end up with a zero

3    damages.  There's just too many -- I always thought as a

4    defense lawyer, being a plaintiff's lawyer was easy.

5    Then I did some plaintiff commercial cases and I realized

6    this isn't so easy.

7         There's too many things that can happen.

8    Witnesses get sick.  Witnesses die.  Your expert is in

9    the hospital.  There's just things that can happen and

10   come the trial and that day when you stand up and address

11   the jury in opening statement that you can't control and

12   you also can't control what kind of day a witness has.

13   That could be viewed cynically I suppose.  But I don't

14   know.  I think witnesses come across the way they are at

15   the end of the day by the time cross is over.

16        All of those things are variables.  I'm a real

17   believer in the jury system.  I believe they come to the

18   right result.  Reasonable results I guess I will say.

19   There's risk and very great uncertainty.  I would put

20   this case right up there at risk for both sides.  This

21   could be a case where the jury is outraged that the

22   defendants denied this coverage.  This is terrible.

23   These poor people.  It could be a case of wait a minute,

24   they are doctors.  They know what they're doing.  They

25   are making these judgments.  It would be nice if

1    everything is covered.  That's not what the contract says

2    and the judge says we have to follow the contract.

3        Bottom line is there was a huge amount of risk

4    in this case which, of course, relates very greatly to

5    the amount of the fee that should be given.  I know when

6    lay people read articles about lawyers getting a third of

7    the contingency or 30 percent or 25, whatever the number

8    is, they get very angry.  That's ridiculous.  That's a

9    lot of money but what they don't account for are the

10   cases taken by those lawyers which are good cases.  They

11   are not frivolous or unfounded, but in the end, yield no

12   recovery and yield no fee.  And that's part I think of

13   the public policy consideration in *Goldberger* that we

14   need to encourage good class actions and I would put this

15   case in that category as reflected by the defendant's

16   ultimate willingness to resolve the case short of trial.

17       I'm supposed to consider the quality of the

18   representation.  As I have already commented, I think the

19   lawyers on both sides of this case did a very good job,

20   an outstanding job.  Obviously I'm supposed to be

21   focusing on the plaintiff here.

22       But the effort, the resources that the

23   plaintiff's firm was able to bring to this case were

24   significant and substantial.  The quality was excellent.

25       I'm supposed to consider the relationship of the

1    fee in relation to the settlement.  It is what it is.  I

2    don't know how to ever analyze that.  It's a third.  It

3    is high.  There are some contingencies before the

4    Connecticut statute I think was amended on personal

5    injury cases that were as high as 50 percent in the old

6    days, but I think a third is a recognized reasonable

7    contingency fee for a case where recovery is uncertain.

8            The claim is a well-founded one.  You have a

9    perfectly right to assert the claim.  It is not

10   frivolous, but the recovery is uncertain.  It's a long

11   way to that recovery.  A comment on that it takes a firm

12   with substantial resources to be able to carry something

13   like this case through to completion.

14           Now I will turn to my lodestar check.  I did say

15   that I find that national rates are the appropriate.

16   That doesn't mean I have to find your national rates

17   appropriate.  In my view, as I pointed to a couple of

18   examples, which are not the major part of the bill, and I

19   understand you very cleverly got Attorney Robinson to

20   come in and do a survey about who is available to do

21   these cases and what rates might be in this district.

22           I'm not sure those rates which are high enough

23   to reflect yours is reasonable, are people who have much

24   hourly work.  I could be mistaken in that regard.

25           I noted that Attorney Robinson who while he does

1    some class action work, also does hourly work, did not

2    volunteer his hourly rate which I suspect is below the

3    top of your hourly rate despite his many years of

4    experience in this district.

5           So I guess where I come out is there's two

6    things I want to put on the record to make clear.  One is

7    if I were required to apply a lodestar in determining the

8    actual fee to be awarded.  In other words, in the old

9    days, if you went through and did a lodestar as the basis

10   for your fee award, I would probably cut the fees of the

11   plaintiff.

12          Now, your fees are higher than the one third.  I

13   did not do that.  I'm not going to spend the time or

14   energy to do that.  There's thousands of hours involved

15   and how many lawyers involved, et cetera.  I just know

16   that if I went through it, I would find certain rates to

17   be higher even on a national level than appropriate.  I'm

18   sure.  I don't want to be pressed on my basis.  I'm

19   fairly confident I would do that.

20          But I'm also confident even if I did that, I

21   would end up with a lodestar number that's still large

22   and not that far from the one-third.

23          So to the extent I'm supposed to look at

24   lodestar as a check, I'm doing that and it is a check and

25   it is in, it is in a reasonable relationship to the

1    one-third contingency.

2            However, this is the second point I want to be

3    clear.  I do not -- in no way should my ruling today in

4    awarding the fee requested ever be cited by plaintiff's

5    counsel or anyone who is aware of this record, as an

6    endorsement of the rates that were shown in your

7    application to be your hourly rates.  Which I now

8    understand really are hourly rates for you folks, so I

9    needed to have that clarification.

10           But I am not by accepting your one-third fee

11   application, which I'm about to do, in any way saying

12   that your hourly rates are reasonable national hourly

13   rates.  I'm not saying they are unreasonable.  Don't

14   misunderstand me.  I would not, how can I say this,

15   counsel should not cite this ruling today at the end of a

16   sentence that says the District of Connecticut has found

17   the hourly rate of Attorney A at X dollars an hour in

18   2019 to be a reasonable national rate because I'm not

19   making that finding.  Okay.

20           Having said that, the Court does find that the

21   work that was engaged in by plaintiff's counsel was

22   outstanding.  The time and effort was substantial and

23   exceptional.  It was vigorous advocacy for the class. It

24   was a great outcome.  They spent all the time necessary

25   to achieve the outcome.  The case was complex.  There was

1     a huge class issue to start with.  The fact it involved

2     mental health and medical issues made it complex as well.

3          There was a substantial period of time covered

4     by this class and claims and the dollar amount that

5     resulted while, as I say, is not the largest settlement

6     of ERISA class action.  This is a very substantial

7     settlement.

8          I guess I'm starting to repeat myself.  I didn't

9     realize I have all these organized notes.  The risk was

10    very high.  The class cert wasn't guaranteed.  Granting

11    of the summary judgment was not out of the question.  I

12    wouldn't say the defendant wasted the Court's time by

13    filing that motion.  Then, of course, trial is an

14    uncertainty.

15         As I say, the quality of the briefing,

16    presentations made to the Court over the course of the

17    life of this litigation have been excellent and

18    outstanding.  The Court finds the fee versus settlement

19    versus one third is reasonable.

20         Other cases, well, the Court is aware of some

21    other decisions by district courts like itself in this

22    circuit in the district in which a third certainly would

23    be viewed as a reasonable award for recovery of less than

24    cases involving recovery of ten million and indeed larger

25    percentages or fractions of fees of such recoveries have

1    been found to be reasonable.  I think especially in light

2    of the fact that this was many years into this case with

3    lots of effort.  We were on the eve of trial.  It was

4    hard fought.  There was a lot of work done to get us to

5    that point.

6         And I guess lastly, the public policy aspect is

7    to encourage highly competent counsel to take on these

8    cases and of course, to succeed, if possible.  The only

9    way to encourage that I believe is by significant fee

10   awards.

11        So the Court finds that the fee application made

12   by the plaintiff's counsel including the cost amounts and

13   the dollar amounts for the fees to be reasonable and

14   awards them.

15        Is there anything further that you think I need

16   to find in that regard or overall as to any findings that

17   need to be made in order to proceed to entering the order

18   in the case?

19        MR. GOLDFARB:  No, Your Honor.  The last

20   sentence the only thing I hadn't heard you mention costs.

21   But I think you mentioned costs in the last sentence.  We

22   have an application for costs.

23        THE COURT:  I'm aware of that application.  I

24   couldn't tell you the dollar amount.  I was aware when I

25   read it.  Here we go.  Is it still $105,168.87?

1          MR. GOLDFARB:  Yes.

2          THE COURT:  You put in estimated amount to carry

3    it to fruition?

4          MR. GOLDFARB:  We had.

5          THE COURT:  Yes.  I find those expenses to be

6    reasonable.  Unless there's anything from the defendant.

7          MR. GESCH:  Nothing further.

8          THE COURT:  Okay.  I have an order prepared

9    which is your proposed order because I think I have

10   approved what you asked me to approve.  I thought I heard

11   somebody say at the beginning about doing an order for

12   me.  Does this need to be changed in any way?  This is

13   what was submitted as part of your unopposed motion for

14   final approval of class settlement, docketed at Docket

15   212 and there was a proposed order which bears the Docket

16   Number of 212-4.

17         MR. GOLDFARB:  I don't think we mentioned.  The

18   only thing we had the colloquy about, Your Honor, was the

19   insert of the Semel Institute to the Plan of Allocation.

20         THE COURT:  Do you know what paragraph that is?

21         MR. GOLDFARB:  As I say, the Plan of Allocation

22   is a paragraph that approves the Plan of Allocation.

23   What I'm not sure about is whether we actually in our

24   prior filings had identified the Semel Institute for the

25   Court as the recipient of residual funds.

1           THE COURT:  Page 3, paragraph 2 of this order

2     you call for me to order that the settlement and all of

3     its exhibits, right, that are hereby incorporated into

4     the final order of judgment including definitions are

5     approved, in effect, and ordered.

6           So I guess you are saying you think it is maybe

7     in that that I document that I'm incorporating.  Where

8     was the Settlement Agreement attached?

9           MR. GOLDFARB:  The Settlement Agreement was not

10    filed.  Not refiled with the final approval.  It was

11    preliminary.  That was at --

12          THE COURT:  Does that need to be submitted to me

13    and attached to the order?

14          MR. GOLDFARB:  The only thing I would suggest,

15    Your Honor, maybe I refile the Plan of Allocation with

16    the Semel Institute included.

17          THE COURT:  You wouldn't file the Settlement

18    Agreement and all of its exhibits.  I guess what you can

19    do is tell me what docket number it is on the docket and

20    include that in a parenthetical in paragraph 2 where it

21    references Settlement Agreement and all of its exhibits,

22    paren, as filed with the Court as document number

23    whatever.

24          MR. GOLDFARB:  203-2.

25          THE COURT:  What you are saying that has to have

```
 1    the Semel Institute added I guess is what you are saying,

 2    so I don't know how we effectuate that.  I can do it by a

 3    separate docket entry or you can resubmit it.

 4            MR. GOLDFARB:  Your Honor, why don't I suggest

 5    why don't I refile.  Why don't I refile the proposed

 6    order granting final approval and include the language

 7    that designates the Semel Institute as the recipient?

 8            THE COURT:  As the name to be inserted in

 9    paragraph whatever or whatever attachment to the

10    Settlement Agreement.

11            MR. GOLDFARB:  Yes.

12            THE COURT:  That would be fine.  I would docket

13    that and you can call it proposed -- my assistant can do

14    what I had her do last night which is to take your

15    filing, take the CMECF off the top, take the word

16    "proposed" out so that when I sign it, it looks like an

17    order.  We'll do that.

18            MR. GOLDFARB:  I will file a one-page notice of

19    filing of revised proposed order.

20            THE COURT:  That's fine.  As soon as you do

21    that, I will enter the order.  Obviously I'm granting the

22    plaintiff's unopposed motion for final approval of class

23    settlement subject to the addition and designation of the

24    Semel Institute at the University of California at Los

25    Angeles.
```

1            The only other matters so that means I've

2    granted the motion for attorney fees, 207. I've granted

3    the motion for settlement, 212.  I previously granted the

4    motion to seal Exhibit C for the reason that it contains

5    personal medical information.  I.e, identifying the

6    identity of people in connection with that.

7            Diahann, Number 203, the motion for settlement,

8    that should have been terminated.  There's an order on

9    the docket that I granted that motion.  That was an

10   oversight.  That would terminate all the pending motions

11   in this case.

12            As soon as you do that filing, you let chambers

13   know or Diahann so I then can enter the order.

14            Anything further to take up in the matter?

15            MR. GOLDFARB:  Not from plaintiffs.

16            MR. GESCH:  No, Your Honor.

17            THE COURT:  Thank you all very much.  As I said,

18   it's been a pleasure having counsel in the case.  I think

19   both sides have done an excellent job for their clients

20   and done it in a way that reflects well on our

21   profession.

22            Thank you very much.  We'll stand in recess.

23   (Whereupon, a recess was taken at 11:17 a.m.)

24

25

1

2

3          COURT REPORTER'S TRANSCRIPT CERTIFICATE.

4    I hereby certify that the within and foregoing is a true

5    and correct transcript taken from the proceedings in the

6    above-entitled matter.

7

8    /s/  Terri Fidanza

9    Terri Fidanza, RPR

10   Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25